

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   GRECIA M. ROCHA,                          Case No.:  24cv1543-GPC(VET)

12                              Plaintiff,     **ORDER GRANTING DEFENDANT'S**
                                               **MOTION TO DISQUALIFY**
13   v.                                        **EXPERT, COUNSEL AND QUILL &**
                                               **ARROW, LLP**
14   FORD MOTOR COMPANY, a Delaware
     Corporation, and DOES 1 through 10,
15   inclusive,                                **[Dkt. No. 22.]**

16                              Defendants.

17

18        Before the Court is Defendant's motion to disqualify Aaron Sims as Plaintiff's

19   expert and disqualify Quill & Arrow, LLP as Plaintiff's counsel.  (Dkt. No. 22.)  The

20   motion is fully briefed.  (Dkt. Nos. 24, 26.)  Prior to the hearing, the Court provided the

21   parties with a tentative order granting Defendant's motion.  On October 10, 2025, the

22   Court held a hearing.  (Dkt. No. 28.)  After hearing oral argument, the Court specifically

23   directed defense counsel to supplement the record with a declaration that the attorney

24   who attended the early neutral evaluation ("ENE") conference had communications with

25   Mr. Sims that were privileged or confidential.  (Dkt. No. 32 at 15-16.)  The Court also

26   directed Plaintiff's counsel to address whether the Court should disqualify the entire firm

27   or just Mr. Treybig.  (*Id.* at 19.)  On October 24, 2025, the parties filed their respective

28

1

supplemental briefs and/or declarations.[1]  (Dkt. Nos. 30, 31, 35.)  On October 31, 2025, the parties filed their respective responses.  (Dkt. Nos. 36, 38.)  On November 14, 2025, the Court held another hearing.  (Dkt. No. 39.)  Based on the reasoning below, the Court GRANTS Defendant's motion to disqualify Aaron Sims, Plaintiff's expert, Mr. Treybig, Plaintiff's counsel and the entire firm of Quill & Arrow, LLP.

## Background

Plaintiff Grecia M. Rocha ("Plaintiff") filed a complaint against Defendant Ford Motor Company ("Defendant" or "Ford") for breach of express and implied warranties under the Song-Beverly Consumer Warranty Act in connection with alleged defects she has experienced while operating her 2020 Ford Ecosport ("Vehicle") that she purchased on October 25, 2020.[2]  (Dkt. No. 1-3, Compl. ¶ 8.)  Ford answered the complaint on August 30, 2024.  (Dkt. No. 2.)  An ENE conference was held on October 30, 2024.  (Dkt. No. 7.)  Eric Reilly ("Mr. Reilly"), Field Service Engineer ("FSE"), at Ford, was assigned to support Ford's counsel in this case; however, he was unavailable to attend the scheduled ENE conference.  (Dkt. No. 22-4, Petersen Decl. ¶ 9.)  On October 21, 2024, Aaron Sims ("Mr. Sims") stepped in to attend the ENE as Ford's representative.  ((*Id.* ¶ 10; Dkt. No. 30-1, Do Decl. ¶ 8.)  At the ENE conference, Plaintiff appeared with her counsel Matthew Treybig of Quill & Arrow, LLP ("Quill & Arrow") and Defendant's representative, Mr. Sims, appeared with Hang Do, Defendant's counsel of record.  (Dkt. No. 30-1, Do Decl. ¶ 9.)  Because the case did not settle, a case management conference was held and a scheduling order issued.  (Dkt. Nos. 7, 8.)

On April 3, 2025, Plaintiff's counsel, Daniel Gopstein of Quill & Arrow, took the deposition of Mr. Reilly, Defendant's Rule 30(b)(6) witness.  (Dkt. No. 38-5, Gopstein Decl. ¶ 3.)  At the deposition, Mr. Gopstein, not knowing who attended the ENE, asked

---

[1] On October 30, 2025, Plaintiff filed an amended supplemental declaration to correct an error in the one originally filed on October 24, 2025.  (Dkt. No. 35.)

[2] The case was removed from state court on August 30, 2024.  (Dkt. No. 1.)

Mr. Reilly who attended the ENE to which defense counsel objected.  (*Id.* ¶ 4.)  Later in the deposition, Mr. Gopstein inquired about Mr. Sims' employment status at Ford and Mr. Reilly responded he was no longer on their team.  (Dkt. No. 38-6, Gopstein Decl., Ex. 1, Reilly Depo at 78:6-15.)  Mr. Gopstein explained that he was confirming Mr. Sims's employment status because he had reached out to the firm regarding potential expert work in other matters but had not yet been retained.  (Dkt. No. 38-5, Gopstein Decl. ¶ 5.)  Mr. Gopstein denies having knowledge that Mr. Sims had attended the ENE in the case.  (*Id.* ¶ 6.)

On April 24, 2025, an inspection of the Vehicle took place.  In attendance were Defendant's representative, Mr. Reilly, and defense counsel Ashley Maxwell, on one side, and Plaintiff and Mr. Sims[3], on the other side.  (Dkt. No. 22-2, Maxwell Decl. ¶ 12.) Plaintiff's counsel did not attend.  (*See id.*)  At the inspection, Mr. Sims took photographs, inspected the vehicle, shadowed Defendant's expert inspection and went on the test drive which he recorded from the back seat.  (*Id.*)  Around the time of the vehicle inspection or shortly thereafter, Ms. Maxwell spoke with Mr. Treybig about "Mr. Sims' involvement, as he appeared as Ford's representative" at the ENE.  (Dkt. No. 30, Maxwell Suppl. Decl. ¶ 8.)  Mr. Treybig denies any recollection of any communication with Ms. Maxwell.  (Dkt. No. 38, Treybig Response Decl. ¶¶ 12, 13.)

On July 30, 2025, Plaintiff served her expert witness disclosure naming Mr. Sims as the sole expert in the field of automotive consulting, inspection and evaluation in the automotive industry.  (Dkt. No. 22-2, Maxwell Decl. ¶ 14; Dkt. No. 22-3, Maxwell Decl. Ex. A.)  The next day, on July 31, 2025, Defendant filed the instant motion to disqualify. (Dkt. No. 22.)

Mr. Sims was formerly employed by Ford from March 2012 until October 2014 as a Technical Service Engineer, and then again from November 2021 to March 2025 as a

---

[3] Mr. Sims stopped working at Ford in March 2025.  (Dkt. No. 22-4, Petersen Decl. ¶ 6.)

an FSE.  (Dkt. No. 22-2, Maxwell Decl., Ex. A at 7-9; Dkt. No. 22-4, Petersen Decl. ¶ 4.)
As an FSE, Mr. Sims worked with dealers to develop training schedules for dealership
technicians and supported them when diagnosing difficult to repair concerns.  (Dkt. No.
22-4, Petersen Decl. ¶ 5.)  He also conducted vehicles inspections, represented Ford as its
Person Most Qualified for depositions and represented Ford in BBB arbitration cases.
(*Id.*)  His duties as an FSE also included supporting Ford's litigation by communicating
with Ford's Office of the General Counsel and its outside counsel, preparing meetings
with Ford's counsel for vehicle inspections, depositions and arbitration.  (*Id.* ¶ 7.)  Mr.
Sims also had access to Ford's internal databases, documents and to in-house counsel and
trial attorneys and during his employment, he was involved in hundreds of lawsuits.  (*Id.*
¶ 8.)

On October 30, 2024, in preparation for the ENE, Mr. Sims met with Ford's
counsel, Ms. Do, via Zoom videoconferencing, where Ford's counsel provided a brief
overview of Ford's legal position as to the merits of Plaintiff's case and discussed its
approach to the anticipated settlement negotiations.  (Dkt. No. 30-1, Do Decl. ¶ 8.)  Mr.
Sims learned about Ford's strategies for the case and for the ENE learning to what extent
Ford was willing to be bound.  (*Id.*)  In preparing for the ENE, Mr. Sims also accessed
additional confidential information regarding the case and this information and its
implications on this and other cases against Quill & Arrow were discussed with Mr. Do.
(*Id.*)  During the ENE, Ford's counsel and Mr. Sims discussed the case multiple times
and he was present and heard comments and assessments by the Court regarding how the
parties might settle the case.  (*Id.* ¶ 9.)  During the ENE, they also discussed the merits of
the case, case strategy and future plans if the case did not settle.  (*Id.* ¶ 10.)  Defendant
was never informed by Quill & Arrow that it was hiring Mr. Sims and did not obtain
Ford's informed consent to employ Mr. Sims to work as an expert in this case.  (Dkt. No.
22-2, Maxwell Decl. ¶ 13.)

In response, Mr. Sims declares that as an FSE, his work was "strictly technical"
and he diagnosed difficult repairs, conducted vehicle inspections and "occasionally

appeared as a corporate witness at depositions." (Dkt. No. 24-2, Sims Decl. ¶ 5.) He states he attended the ENE on October 30, 2024 as Ford's representative in a ministerial capacity. (*Id.* ¶ 10.) At the ENE, he claims his assistance was limited to technical and factual questions about the Vehicle. (*Id.*) He also maintains that he never had full settlement authority to settle because such decisions rested with Ford's counsel. (*Id.* ¶ 9.) In a supplemental declaration, Mr. Sims further declares that his role at the ENE was limited to providing factual and technical assistance to Ford's counsel and he did not participate in any settlement negotiations, case strategy discussion or valuation decisions. (Dkt. No. 38-7, Sims Suppl. Decl. ¶ 4.) He states that the pre-ENE Zoom conference concerned the logistics of the conference. (*Id.* ¶ 6.) At that conference, he was also told to state he had authority to bind Ford to a pre-determined settlement amount but does not recall the amount. (*Id.* ¶ 7.) He claims the Zoom call did not involve privileged or strategic litigation content and he did not receive any confidential information, litigation analyses, internal memoranda or draft settlement positions or receive any legal advice, case evaluation or defense theories. (*Id.* ¶¶ 8, 9.)

Mr. Treybig also responds that his firm retained Mr. Sims in April 2025 to perform an independent technical inspection of the Vehicle seeking an opinion about the Vehicle's mechanical performance, repair history and condition. (Dkt. No. 35, Treybig Am. Suppl. Decl. ¶ 4.) According to Mr. Treybig, Mr. Sims was chosen based on his technical expertise in vehicle diagnostics and prior experience as a FSE and not because of any relationship with Ford. (*Id.*) Mr. Treybig asserts that he did not recall that Mr. Sims attended the ENE on behalf of Ford as he has attended many ENE conferences and did not keep track of which Ford representative was present. (Dkt. No. 38, Treybig Response Decl. ¶ 3.) He also states that no one at Quill & Arrow knew that Mr. Sims had attended the ENE on behalf of Ford. (*Id.*)

Prior to his retention, Mr. Treybig questioned Mr. Sims about whether he had any conflicts of interest or ongoing obligations to Ford and he responded in the negative. (Dkt. No. 35, Treybig Am. Suppl Decl. ¶ 5.) On April 24, 2024, Mr. Treybig did not

attend the vehicle inspection and Ford's counsel did not express any concerns at the time about Mr. Sims' involvement.  (*Id.* ¶ 6.)  Mr. Treybig asserts that prior to the motion to disqualify filed on July 31, 2025, Ford made no effort to inform him about the conflict with Mr. Sims.  (*Id.* ¶ 5.)  Mr. Sims and Mr. Treybig both declare that they have never discussed any confidential information relating to Mr. Sims' prior employment with Ford, such as any attorney-client communications, litigation strategies or privileged documents.  (Dkt. No. 24-1, Treybig Decl. ¶¶ 9, 10; Dkt. No. 35, Treybig Am. Suppl. Decl. ¶ 16; Dkt. No. 24-2; Sims Decl. ¶ 13; Dkt. No. 38-7, Sims Suppl. Decl. ¶¶ 17, 21, 23.)

## Discussion

### A.    Motion to Disqualify Expert Witness

"Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system."  *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2014) (citing *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) ("A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial . . . including disqualifying expert testimony.")).  But, disqualifying an expert should only rarely be imposed because it is drastic measure.  *Id.* (citations omitted).

When considering whether to disqualify an expert based on a prior relationship with an adversary, courts will disqualify an expert if "(1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation."  *Hewlett-Packard*, 330 F. Supp. 2d at 1092; *see also Veazey v. Hubbard*, Civil No. 08–00293 HG–LEK, 2008 WL 5188847, at *5 (D. Haw. Dec. 11, 2008); *In re JDS Uniphase Corp. Sec. Litig.*, No. 02–1486, 2006 WL 2845212, at *1 (N.D. Cal. Sept. 29, 2006).  Both factors must be met for disqualification to be granted.  *Hewlett-Packard*, 330 F. Supp. 2d at 1093.  Courts are also directed to consider whether disqualification would be fair to the affected party and

would promote the integrity of the legal process. *Id.* The moving party bears the burden of demonstrating that disqualification is warranted. *Id.* at 1096.

### 1.    Confidential Relationship

The Court first considers whether Ford had a confidential relationship with Mr. Sims. On this factor the Court considers whether "it was reasonable for [the party seeking disqualification] to believe that a confidential relationship existed, [ ] and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." *Id.* at 1093 (citations omitted).

Here, while employed at Ford, Mr. Sims was Ford's representative at the ENE and was engaged in an attorney-client relationship with Ford's counsel of record in this case. An attorney client relationship involves a confidential relationship. *See e.g., Kracht v. Perrin, Gartland & Doyle*, 219 Cal. App. 3d 1019, 1023 (1990) ("[T]he attorney -client relationship . . .is unique and involves a highly personal and confidential relationship . . .") (citation and internal quotations omitted). As such, a confidential relationship existed between Mr. Sims, Ford's representative at the ENE, and Defendant, through its counsel of record when they prepared for and attended the ENE conference.

### 2.    Disclosure of Confidential Information

Second, the Court considers whether Ford disclosed confidential information to Mr. Sims that is relevant to the current case. Confidential information is defined as information "of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege," including discussions of a party's "strategy in the litigation," and a party's "view of the strengths and weaknesses of each side[.]" *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations and internal quotations omitted). Attorney-client communications are presumptively confidential. *City Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 328 (2002) (citing Cal. Evid. Code ¶¶ 917, 952); *Costco Wholesale Corp. v. Superior Ct*., 47 Cal. 4th 725, 732 (2009) (citation omitted) (the attorney-client privilege safeguards the

confidential relationship between the client and the attorney "to promote full and open discussion of the facts and tactics surrounding individual legal matters.").

In preparation for the ENE, counsel of record met with Mr. Sims and discussed confidential and privileged information about the Ford's legal position as to the merits of this case as well as litigation and settlement strategies. (Dkt. No. 30-1, Do Decl. ¶ 8.) During the ENE, Ford's counsel and Mr. Sims discussed the case multiple times and was present and heard comments and assessments by the Court regarding how the parties might settle the case. (*Id.* ¶ 9.) They also discussed the merits of the case, case strategy and future plans if the case did not settle. (*Id.* ¶ 10.) While Mr. Sims states that his role at the ENE was limited to providing factual and technical assistance to Ford's counsel and he did not "participate" in any settlement negotiations or case strategy discussions, he does not specifically dispute that he was privy and present during confidential discussions between Ford's counsel and the Court and as such, was exposed to discussions about Ford's litigation and settlement strategies.[4]  As such, Ford has shown its counsel disclosed confidential, privileged information to Mr. Sims relevant to this litigation.

### 3.    Fundamental Fairness and Prejudice

Next, courts consider whether any prejudice might occur if an expert is or is not disqualified and whether disqualification made at the late stages of litigation will likely disrupt the judicial proceedings. *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094-95.

Ford argues Mr. Sims must be disqualified in order to protect its confidential communications and litigation strategies. (Dkt. No. 22 at 16-17.)  Plaintiff maintains that if Mr. Sims is removed, it will devastate her ability to prove her claims. (Dkt. No. 24 at 8.)

---

[4] According to the order scheduling the ENE conference, "***All discussions during the ENE are informal, off the record, privileged, and confidential***."  (Dkt. No. 5 at 2 (emphasis in original)); Civ. L. R. 16.1(c)(1) ("[t]he ENE conference will be informal, off the record, privileged, and confidential.").  Any communications made to the Magistrate Judge, in a caucus or group meeting, at the ENE are privileged and confidential.

Here, Ford will be unduly prejudiced if Mr. Sims is not disqualified because he was exposed to attorney-client communications that are privileged and should be protected.  On the other hand, Plaintiff, in a conclusory manner, alleges that "[r]emoving [Mr. Sims] would devastate her ability to prove her Song-Beverly claims."  (Dkt. No. No. 24 at 8.)  In evaluating this claim, it must be borne in mind that Rocha filed this action in August 2024 and only named Mr. Sims as her expert in July 2025.  There is no suggestion that Mr. Sims was instrumental in identifying the technical basis for filing this lawsuit.  Nor could he have been, he was employed by Ford until April of 2025.  Moreover, she has not alleged an inability to find another qualified expert in the automotive industry or presented any other grounds that would outweigh the public's interest in preserving judicial integrity.  *See Tabaian v. Intel Corp.*, No. 3:18-cv-00326-HZ, 2018 WL 4566257, at *9 (D. Or. Sept. 22, 2018) (plaintiffs failed to support their alleged inability to find another qualified expert with any specific detail).

Finally, the case is not in the late stages.  Although expert discovery deadline expired on October 29, 2025, the Plaintiff may be granted leave to designate an alternative expert.  (Dkt. No. 17.)  Fundamental fairness supports disqualification of Mr. Sims.

### 4.    Integrity of the Legal Process

Ford argues that the integrity of legal proceedings is threatened if Mr. Sims is not disqualified because he has confidences obtained while employed at Ford that directly relate to this case.  (Dkt. No. 22 at 15-16.)  Plaintiff does not address this factor.

Here, Mr. Sims, the corporate representative representing Defendant's interest at the ENE, armed with Ford's litigation strategies, switched sides months later to assist Plaintiff as her expert.  Mr. Sims not only has an underlying basic understanding of Ford's modus operandi, patterns of operation, and decision-making process while being employed as an FSE at Ford but he also was privy to attorney client information while either preparing for the ENE and/or attending the ENE in this very case.  The rules governing disqualification are designed to protect against the potential breach of such

confidences and the Court must therefore "protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." *See Gordon v. Kaleida Health*, No. 08-CV-378S F, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013). The integrity of the legal process supports disqualification. Accordingly, after consideration of the factors, the Court GRANTS Defendant's motion to disqualify Mr. Sims as Plaintiff's expert.

## B.    Motion to Disqualify Counsel

In determining whether to disqualify counsel, the Court applies California law. *In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue."). District courts have discretion to disqualify counsel. *See People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc*., 20 Cal. 4th 1135, 1143-44 (1999) ("Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion."). "A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.'" *Id*. at 1145 (quoting Cal. Civ. Code § 128(a)(5)). Motions to disqualify counsel ultimately "involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." *Id.* "[A] disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." *Id.* Ultimately, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *Id.* Therefore, "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id.*

"[W]hile disqualification is a drastic measure and motions to disqualify are sometimes brought by litigants for improper tactical reasons, disqualification is not 'generally disfavored.'" *M'Guinness v. Johnson*, 243 Cal. App. 4th 602, 608, 627 (2015) (rejecting district court cases stating disqualification is generally disfavored because, *inter alia*, the cases did not rely on California law). "Indeed, when the circumstances of a disqualifying conflict exist . . . disqualification is required." *Id.* at 608.

"[I]n order to protect client confidences delivered to and from experts, [courts] have the power and obligation to disqualify attorneys who knowingly hire opposing counsel's expert witnesses." *Collins v. State of Cal.*, 121 Cal. App. 4th 1112, 1126 (2004). The purpose is to protect the "confidentiality of communications between attorney and client" which is fundamental to our legal system. *Id.* When considering the disqualification of counsel due to communications with an opposing party's expert, the court must determine whether the moving party has shown that the expert "possesses confidential attorney-client information materially related to the proceedings before the court." *Id. (quoting Shadow Traffic Network v. Superior Ct.*, 24 Cal. App. 4th 1067, 1084-85 (1994)). The moving party does not need to disclose the actual confidential information but should provide the court with the nature of the information and its material relationship to the proceeding. *Id.* "Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment." *Id.* This presumption may be rebutted by the opposing party by "preponderance of the evidence of the nonexistence of the presumed fact." *Id.* at 1129 (citing *Shadow Traffic Network.*, 24 Cal. App. 4th at 1085).

Contrary to Plaintiff's argument that the rebuttable presumption does not apply because it involves an independent expert rather than an insider or former employee, the rebuttable presumption applies in cases involving both nonemployee experts and former

employees.[5]  *See Shandralina G. v. Homonchuk*, 147 Cal. App. 4th 395, 409-10 (2007) (recognizing rebuttable presumption expanded to former employee and expert); *Shadow Traffic*, 24 Cal. App. 4th at 1085 (applying rebuttable presumption involving a nonemployee expert previously interviewed by opposing counsel and exposed to other side's confidential information); *In re Complex Asbestos Litig*., 232 Cal. App. 3d at 596 (rebuttable presumption applied involving a former paralegal).

Here, during the course of the attorney client relationship between Mr. Sims, acting as Ford's corporate representative, and Ford's counsel of record, Mr. Sims was exposed to confidential information about Ford's legal position regarding the merits of Plaintiff's case, its approach to settlement negotiations, and its strategies for the ENE conference. (Dkt. No. 30-1, Do Decl. ¶¶ 8, 9.)  Even though Mr. Sims claims he did not "participate" in matters involving confidential information during the ENE, he does not deny he was exposed to privileged and confidential information as a participant.  Further, he admits he was provided confidential information when Ford's counsel counseled him on the maximum settlement amount at the pre-ENE meeting but does not recall the number. Five months later, Mr. Sims switched sides and was hired as an expert by Plaintiff's counsel.

Because Mr. Sims possesses confidential attorney-client information related to this case, there is a presumption that this confidential information has been used or disclosed to Mr. Treybig.  *See Shadow Traffic*, 24 Cal. App. 4th at 1085.  Therefore, Plaintiff's argument that Defendant is required to make a showing of an actual disclosure is not supported.  *See id.* ("presumption is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known" by the adversary's attorney and

---

[5] In *Collins*, the court carved an exception to the *ShadowTraffic* rebuttable presumption where the moving party has the burden to affirmatively prove confidential information has been transmitted when the moving party retains control over the expert.  *See Collins*, 121 Cal.App.4th at 1129.  Once the moving party no longer has control over the expert, he or she will be at a loss to prove what is known by the adversary's attorney and legal staff and therefore the rebuttable presumption make "eminent sense." *Id.*  Here, Ford no longer had control over Mr. Sim; therefore, the exception in *Collins* does not apply.

24cv1543-GPC(VET)

expert).  Given the attorney-client relationship between defense counsel and Mr. Sims with respect to the confidential and privileged communications in this case, it must be presumed that Mr. Treybig obtained confidential information from Mr. Sims.

In trying to rebut the presumption, both Mr. Sims and Mr. Treybig declare that they have not discussed any confidential information that Mr. Sims may have obtained while employed at Ford.  (*See* Dkt. No. 35, Treybig Am. Suppl. Decl. ¶ 11 ("We have not discussed any alleged privileged Ford communications, litigation strategies, or internal matters from his prior employment."); Dkt. No. 24-1 Treybig Decl. ¶¶ 9, 10; Dkt. No. 24-2, Sims Decl. ¶ 13 ("At no time have I discussed this case, Rocha, with Plaintiff's counsel in any manner relating to my prior role as an employee of Ford. I have not shared with Plaintiff's counsel any confidential information, attorney-client communications, or privileged materials that I may have encountered during my prior employment with Ford.").   However, California courts have held that the presumption cannot be rebutted by declarations by the interested parties stating that they did not receive any confidential information from the conflicted individual.  *See In re Complex Asbestos Litig*., 232 Cal. App. 3d at 598 (presumption not rebutted by providing evidence that paralegal did not disclose any confidential information or that any such information was sought from paralegal); *Shadow Traffic*, 24 Cal. App. 4th at 1086-87 (presumption not rebutted despite declaration that attorney never inquired of the expert about what was discussed in confidential meeting with opposing counsel).

Further, courts have explained that the ability to separate confidential information learned from the prior relationship is limited because, in this case, Mr. Treybig "could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice" Mr. Sims rendered to him.  *See Shadow Traffic*, 24 Cal. App. 4th at 1086; *see also Shandralina G*., 147 Cal. App. 4th at 407 ("When an attorney consults with an expert and obtains confidential information protected by the work product privilege, and the opposing attorney later acquires the privileged information during communications with that expert, the opposing attorney

24cv1543-GPC(VET)

can be disqualified because, '[h]aving become privy to [the attorney's] work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case.'"); *Pellerin v. Honeywell Int'l Inc*., No. 11cv1278-BEN(CAB), 2012 WL 112539, at *3 (S.D. Cal. Jan.12, 2012) (citation omitted) (not persuasive that expert can parse his knowledge of Honeywell's confidential information to only rely upon what is provided to him in the litigation to be unpersuasive because the "human brain does not compartmentalize information in that manner."). Because Plaintiff has failed to rebut the presumption by providing "proof as to the nonexistence of the presumed fact[]", *see Shadow Traffic*, 24 Cal. App. 4th at 1085, disqualification of Mr. Treybig is required.

Defendant also argues that Quill & Arrow[6] must be disqualified because Mr. Treybig acted unethically by knowingly hiring Mr. Sims, and upon learning of the conflict, failed to comply with applicable Rules of Professional Conduct governing attorney conduct in retaining expert witnesses. On the one hand, whether Mr. Treybig hired Mr. Sims knowing that he was a former Ford representation who attended the ENE conference in this case is disputed. Mr. Treybig states that he was not aware or recall that Mr. Sims attended the ENE because he attends many ENE conferences and does not keep track of which Ford representatives are present. (Dkt. No. 38, Treybig Response Decl. ¶ 3.) Mr. Sims also declares he did not remember that he attended the ENE conference or the details when asked by Mr. Treybig if there was a conflict. (Dkt. No. 38-7, Sims Suppl. Decl. ¶ 10.) Mr. Treybig's failure to recall if Mr. Sims attended the ENE in this case stems from Quill & Arrow's failure to adopt proper procedures to conduct conflict checks of its experts. If it had, then Mr. Sims' conflict would have been known early on.

Plaintiff further relies on a declaration of Mr. Gopstein to rebut the presumption. It does not appear that Mr. Gopstein, who also represented Plaintiff, knew Mr. Sims had attended the ENE when he deposed Eric Reilly on April 3, 2025. According to the

---

[6] Defendant summarily argues that Quill & Arrow should be disqualified without differentiating its analysis between disqualifying Mr. Treybig and the entire firm of Quill & Arrow. (Dkt. No. 22.)

deposition transcript, Mr. Gopstein asked Mr. Reilly at the deposition who attended the ENE on behalf of Ford but could not get an answer because defense counsel objected. (Dkt. No. 38-5, Gopstein Decl. ¶¶ 3, 4.)  If Mr. Gopstein had known that Mr. Sims attended the ENE conference, he would have questioned Mr. Sims accordingly when he reached out to Quill & Arrow to be retained as an expert.  Accordingly, Mr. Gopstein blames Ford for actively withholding information regarding Mr. Sims' appearance at the ENE and prevented Plaintiff from learning about the conflict.  However, Mr. Gopstein's failure to know who attended the ENE in the case shows the lack of communication between Mr. Treybig and Mr. Gopstein about key facts, case history, and procedure when acting as co-counsel.  Rather than intentional conduct, it appears that the retention of Mr. Sims was due to the failure of Quill & Arrow's duty to conduct a conflict check of its expert.

Having said that, however, despite Ford's assertion that it informed Mr. Treybig at or shortly after the inspection on April 24, 2025 about Mr. Sims' involvement, there is no corroborating evidence that Ford informed Plaintiff's counsel of its objections to Mr. Sims until July 31, 2025 when it filed the instant motion.[7]  Ms. Maxwell states that at the time of the inspection or shortly thereafter she spoke with Mr. Treybig about "Mr. Sims' involvement, as he appeared as Ford's representative" at the ENE.  (Dkt. No. 30, Maxwell Suppl. Decl. ¶ 8.)  Yet, Ms. Maxwell provides no detail as to what was discussed at this conversation, and at the follow up hearing, Ms. Maxwell did not recollect what was discussed during that conversation.  There was also no follow up communication with Mr. Treybig memorializing this conversation regarding a

---

[7] While implied waiver was not argued by Plaintiff and it does not appear to apply to the facts of this case, a party should timely object once it learns about a conflict of interest; otherwise, California law recognizes that attorney disqualification may be impliedly waived when a party fails to bring a motion to disqualify in a timely manner and extreme prejudice has been shown by the opposing party.  *Liberty Nat'l Enters., L.P. v. Chicago Title Ins. Co.*, 194 Cal. App. 4th 839, 845 (2011). Here, the disqualification motion was filed within 14 weeks of Ford learning that Mr. Sims was retained as an expert by Plaintiff.

substantive and important matter.  Therefore, it could be true that Mr. Treybig did not know Mr. Sims attended the ENE and did not know about Ford's objections to Mr. Sims until the disqualification motion was filed.

Further, even if the Court credits Mr. Treybig's claim that he was first notified of the conflict with Mr. Sims, when the instant motion was filed on July 31, 2025, on that date, he was "duty bound" to refrain from "talking directly with [Mr. Sims] until the court resolved the problem."  *See Collins*, 121 Cal. App. 4th at 1132 ("we do not rule out the possibility that in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification.").  However, Mr. Treybig continued to have communications with Mr. Sims as demonstrated by the submission of Mr. Sims' expert report on September 15, 2025 and his rebuttal expert report on September 29, 2025.  (Dkt. No. 38-8, Sims Suppl. Decl., Ex. 1.)  It does not appear that Mr. Treybig took the conflict seriously or understood his obligations.

Ultimately, because Mr. Treybig is presumed to have obtained confidential and/or privileged communications between Mr. Sims and Ford's counsel of record and the presumption has not been rebutted, the Court GRANTS Defendant's motion to disqualify Mr. Treybig.

## C.    Vicarious Liability

Defendant also moves to disqualify Plaintiff's entire firm, Quill & Arrow based on Mr. Treybig's conduct.  (Dkt. No. 22 at 17-22.)  Plaintiff opposes.  (Dkt. No. 31.)

In general, a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm.  *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc*., 20 Cal. 4th 1135, 1146 (1999).  In considering a motion to disqualify counsel, the Court takes into account the following policy considerations: "(1) a client's right to chosen counsel; (2) an attorney's interest in representing a client; (3) the financial burden on a client to replace disqualified counsel; (4) the possibility that tactical abuse

underlies the disqualification motion; (5) the need to maintain ethical standards of professional responsibility; and (6) the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 807-08 (2010) (citation omitted). As to the first and third factors, a plaintiff has an "interest in preserving the continuity of the lawyer-client relationship; otherwise, if such relationships were easily disrupted, complicated cases . . . would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers." *UMG Recordings, Inc. v. MySpace, Inc.*, 526 F. Supp. 2d 1046, 1065 (C.D. Cal. 2007). Here, the action was filed more than a year ago on August 23, 2024, and discovery is nearly completed. Disqualification of Quill & Arrow will delay these proceedings and any recovery for Plaintiff, in the event that she prevails or settles the action. These factors favor Plaintiff.

As to protection of Ford's confidential information, in *Shadow Traffic*, the court indicated that something less than disqualification of the entire law firm could have been ordered had the defendant proven that only certain attorneys in the firm had been exposed to plaintiff's confidences. *Shadow Traffic Network*, 24 Cal. App. 4th at 1088. Although vicarious disqualification is the general rule and courts should presume knowledge is imputed to all members of a tainted attorney's law firm, "in the proper circumstances, the presumption [of vicarious disqualification] is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case." *Kirk,* 183 Cal. App. 4th at 801 (2010) (discussing history of the law of vicarious disqualification and recognizing case law is mixed on whether vicarious disqualification of the entire firm is automatic). The California Rules of Professional Conduct also permit ethical screens as long as there are preventative measures to prevent information from being conveyed and they are timely imposed. *See* Cal. Rules of Prof. Conduct, Rules 1.10(a)(2)(ii) and 1.18(d)(2)(i).

In this case, Mr. Sims was exposed to confidential information about Ford's legal position regarding the merits of Plaintiff's case, its approach to settlement negotiations, and its strategies for the ENE conference.  The Court has found that the conflicted party is Mr. Sims and Mr. Treybig is presumed to have obtained confidential information from Mr. Sims regarding Ford's legal position and strategies leading up to and at the ENE. Based on this, the Court has disqualified Mr. Sims and Mr. Treybig.  To rebut any presumption that would apply against Quill & Arrow, Plaintiff bears the burden of proof as to the nonexistence of the presumed fact, i.e. exposure of the confidential information to other attorneys at the firm.

"Screening is a prophylactic, affirmative measure to avoid both the reality and appearance of impropriety."  *In re Complex Asbestos Litig.,* 232 Cal. App. 3d at 594 (citation omitted). In the context where counsel has hired a side-switching employee, retained a side-switching expert, or in this case a side switching representative to expert, courts look at whether an effective screen has been established between the tainted counsel or individual and the rest of the firm.  *See e.g., In re Complex Asbestos Litig*., 232 Cal. App. 3d 572, 596 (1991) ("To rebut the presumption, the challenged attorney has the burden of showing that the practical effect of formal screening has been achieved."); *W. Digital Corp. v. Superior Ct*., 60 Cal. App. 4th 1471, 1485 (1998) (the defendant who hired expert firm employee rebutted presumption that confidential information was disclosed to expert with evidence that expert's employer erected effective "screening wall.")

A showing "that the practical effect of formal screening has been achieved must satisfy the trial court that the [individual exposed to the other side's confidences] has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed."  *In re Complex Asbestos Litig*., 232 Cal. App. 3d at 596.

1   "The typical elements of an ethical wall are: [1] physical, geographic, and

2   departmental separation of attorneys; [2] prohibitions against and sanctions for discussing

3   confidential matters; [3] established rules and procedures preventing access to

4   confidential information and files; [4] procedures preventing a disqualified attorney from

5   sharing in the profits from the representation; and [5] continuing education in

6   professional responsibility." *Kirk*, 183 Cal. App. 4th at 810-11 (quoting *Henriksen v.*

7   *Great Am. Savings & Loan*, 11 Cal. App. 4th 109, 116 n.6 (1992)).  The specific elements

8   of an effective screen will vary from case to case, although two elements are necessary:

9   First, the screen must be imposed timely; a firm must impose screening measures when

10  the conflict first arises and not wait until the trial court imposes screening measures as

11  part of its order on the disqualification motion.  *Kirk,* 183 Cal. App. 4th at 810 (citing

12  *Klein v. Superior Ct.,* 198 Cal. App. 3d 894, 906 (1988)).  Second, declarations stating

13  that confidential information was not conveyed or exchanged or that the disqualified

14  attorney did not work on the case are not sufficient.  *Id.* (citing *SpeeDee Oil*, 20 Cal. 4th

15  at 1152 & n.5).

16       Here, the motion to disqualify was filed on July 31, 2025.  It was not until October

17  2025 when an ethical screen restricting access to the electronically stored file in a secure

18  document management system was implemented.  (Dkt. No. 35, Treybig Am. Suppl.

19  Decl. ¶ 9.)  According to Mr. Treybig, Quill & Arrow implemented an ethical screen in

20  early October 2025 when the IT staff restricted access to this case file exclusively to Mr.

21  Treybig, Kevin Jacobson, Michael Jahangani and essential administrative staff.  (*Id.* ¶ 9.)

22       Mr. Treybig declares that since early October 2025, he has not discussed the facts

23  of this case with any other attorney at the firm, which he also confirmed at the hearing.

24  (*Id.* ¶ 12.)  Mr. Treybig also states and confirmed at the hearing that Mr. Sims has only

25  communicated with himself about the case.  (*Id.* ¶ 10.)  However, it is insufficient to

26  simply produce declarations stating that confidential information was not conveyed or

27  that the disqualified attorney did not work on the case; an effective wall involves the

28

imposition of preventive measures to guarantee that information will not be conveyed. *See SpeeDee Oil*, 20 Cal. 4th at 1152 & fn. 5.

At the hearing, Mr. Treybig acknowledged that Kevin Jacobson, Michael Jahangani and essential administrative staff, not identified, have worked on this case and should also be disqualified. Further, Ford provided a declaration and supporting documentation that some attorneys and support staff received Mr. Sims' expert and rebuttal expert reports and because those reports may contain implicit impressions or data derived from confidential information of Mr. Sims, those individuals should be disqualified. (*See* Dkt. No. 36-1, Maxwell Second Suppl. Decl. ¶ 4; *id*., Ex. A.) There is no indication that any screen was implemented as to these potentially tainted individuals.

According to Plaintiff, there are more than twenty attorneys who have been completely shielded from the case and have no information or knowledge about the substance of this case. (Dkt. No. 31 at 6.) However, Quill & Arrow has not fully identified the attorneys and support administrative staff who would be on the tainted side and are likely to have been exposed to the above-identified confidential information. Other than Mr. Treybig maintaining a self-imposed prohibition against discussing the case with others, there is nothing in writing which informs attorneys and employees at Arrow & Quill of the existence of the wall and identifies the tainted and untainted employees. Nor is there any communication which describes the protocols in place that are calculated to avoid disclosure of confidential information to the untainted employees. Nor is there mention of what consequences would be imposed for violating the screening procedures.

The Court finds that Arrow & Quill has failed to rebut the presumption of vicarious disqualification by adopting belated and inadequate screening measures. While the Court recognizes that Plaintiff, herself, is faultless in the issues raised by the disqualification motion and that she will suffer delays by the disqualification of her attorneys, Plaintiff's counsel was tardy in taking appropriate steps to create an ethical wall between tainted attorneys and employees from untainted attorneys and employees

and what he implemented was not sufficient. The Court finds that the screening mechanism has not sufficiently reduced the likelihood that that non-tainted attorneys will receive and use information possessed by Mr. Sims or Mr. Treybig.

In balancing the need to maintain ethical standards of professional responsibility with Plaintiff's right to counsel of their choice, the Court GRANTS Defendant's motion to disqualify the entire firm of Quill & Arrow.

## Conclusion

Based on the above, the Court GRANTS Defendant's motion to disqualify Plaintiff's expert witness, Plaintiff's counsel and the entire firm of Quill & Arrow, LLP. Plaintiff shall file a notice of Plaintiff's contact information within 2 days of this order. Plaintiff shall be granted 30 days to find and retain new counsel. If new counsel does not make an appearance within 30 days, Plaintiff will be required to represent herself.

IT IS SO ORDERED.

Dated: December 9, 2025

Hon. Gonzalo P. Curiel
United States District Judge